**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARC S. CASON, *#180571*,

    Plaintiff,

            v.                          Civil Action No. PX-20-692

CORIZON HEALTH SERVICES, *et al.*,

    Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CORIZON HEALTH, INC., DR. BOLAJI ONABAJO, DR. ASRESAHEGN GETACHEW, DR. YONAS SISAY, AND DR. HIRUY BISHAW'S MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT**

Defendants Corizon Health, Inc., Dr. Bolaji Onabajo, Dr. Asresahegn Getachew, Dr. Yonas Sisay, and Dr. Hiruy Bishaw ("Corizon Defendants"),[1] by undersigned counsel, hereby submit this Memorandum of Law in support of their Motion to Dismiss or Alternatively for Summary Judgment.

## I. STATEMENT OF FACTS

**A.      Plaintiff's Allegations**

Marc Cason ("Plaintiff"), an inmate incarcerated at Western Correctional Institution ("WCI"), initiated this action by filing a *pro se* civil rights Complaint pursuant to 42 U.S.C. § 1983 on March 16, 2020. CM/ECF No. 1.

Plaintiff alleges he was incarcerated Dorsey Run Correctional Facility ("DRCF") from March 5, 2018 until August 23, 2019 and suffered because of wheelchair inaccessibility, filthy dorm and bathroom, and shower conditions. CM/ECF No. 1, P. 2. He claims he was hospitalized

---

[1] Undersigned counsel represents Corizon Defendants for allegations arising January 1, 2019 or later, after Corizon Health took over the medical services contract from Wexford Health.

for blood clots in his bladder from those conditions and was given inadequate medical attention. *Id.*

Plaintiff attached to his Complaint copies of Requests for Administrative Remedies ("ARPs") indicating that he had transferred on August 23, 2019 but he had none of his property, including catheters. CM/ECF No. 1-2, PP. 1-2. He complained that he had been using the same catheter for over a week and had developed a UTI and he had yet to see the doctor. *Id.* Plaintiff also included responses to his ARPs indicating that he was not initially provided with catheters or seen by a provider within the established time frame. CM/ECF No. 1-2, PP. 3-4. Another ARP response indicates that multiple site assessments determined that modifications to existing showers, lavatories, and toilets was warranted, including the installation of additional grab bars. CM/ECF No. 1-2, P. 5.

Plaintiff then filed a supplement to his Complaint on April 3, 2020. CM/ECF No. 5. He contends that beginning around July 16, 2018 to August 26, 2018, he suffered severe bladder and urinary tract infections ("UTIs") from filthy conditions at DRCF. CM/ECF No. 5, P. 2. Plaintiff alleges he was sent back and forth to the hospital with severe bleeding and excruciating pain from clots in his bladder only to be sent back over to DRCF. *Id.* He asserts he still suffers bladder problems. *Id.* Plaintiff seeks compensatory and punitive damages for pain and suffering. CM/ECF No. 5, P. 3.

**B.     Plaintiff's Medical Conditions and Treatment**

On or around March 5, 2018, Plaintiff transferred from WCI to DRCF. Ex. A: Decl. of Dr. Bolaji Onabajo ¶ 5; Ex. A-1: Cason MR, P. 235. On March 7, 2018, Plaintiff was sent to Baltimore-Washington Medical Center ("BWMC") for a drug overdose. Ex. A: ¶ 5; Ex. A-1: PP. 236-41. After being discharged from BWMC, Plaintiff saw PA Francis Oluwo at the Jessup

Regional Infirmary ("JRI") on March 11, 2018. Ex. A: ¶ 6; Ex. A-1: PP. 244-45. Plaintiff's medical history was significant for Hepatitis C ("HCV"), chronic pain, paraplegia, anemia, and major depressive disorder. Ex. A: ¶ 6; Ex. A-1: PP. 244-45. PA Oluwo noted that Plaintiff had been sent to the BWMC ER and was then transferred to Bon Secours Hospital ("BSH") for further management. Ex. A: ¶ 6; Ex. A-1: PP. 244-45. A chest x-ray, CT scan of the head, EEG, echo, and carotid Doppler were all normal. Ex. A: ¶ 6; Ex. A-1: PP. 244-45. Plaintiff was found to have a UTI but cultures were negative. Ex. A: ¶ 6; Ex. A-1: PP. 244-45. He was diagnosed with altered mental status and UTI and discharged with IV antibiotics. Ex. A: ¶ 6; Ex. A-1: PP. 244-45. He was admitted to JRI for completion of the IV antibiotics. Ex. A: ¶ 6; Ex. A-1: PP. 244-45.

On March 17, 2018, Plaintiff saw Dr. Yonas Sisay at JRI. Ex. A: ¶ 7; Ex. A-1: PP. 276-77. Dr. Sisay performed an exam and noted Plaintiff had no new complaints. Ex. A: ¶ 7; Ex. A-1: PP. 276-77. He continued the same management. Ex. A: ¶ 7; Ex. A-1: PP. 276-77. On March 18, 2018, Plaintiff saw Dr. Hiruy Bishaw during weekend rounds. Ex. A: ¶ 7; Ex. A-1: PP. 283-84. Plaintiff was awake and alert and had no complaints. Ex. A: ¶ 7; Ex. A-1: PP. 283-84. Dr. Bishaw noted Plaintiff's altered mental status had resolved and continued his medications. Ex. A: ¶ 7; Ex. A-1: PP. 283-84. On March 19, 2018, Plaintiff transferred from JRI back to DRCF after he completed his IV antibiotics. Ex. A: ¶ 7; Ex. A-1: PP. 287-89.

Dr. Onabajo saw Plaintiff on March 20, 2018 at DRCF for a chronic care visit. Ex. A: ¶ 8; Ex. A-1: PP. 292-95. Plaintiff was a 58-year-old thin, wheelchair-bound paraplegic with HCV who had been in the ED and admitted for altered mental status and UTI from March 8 through March 11. Ex. A: ¶ 8; Ex. A-1: PP. 292-95. His only complaint was a persistent tremor on his left leg. Ex. A: ¶ 8; Ex. A-1: PP. 292-95. Plaintiff reported he was on Neurontin and

Baclofen for it, but a review of his discharge summary indicated that he was previously on Tramadol, and the Neurontin was so much he developed the altered mental status. Ex. A: ¶ 8; Ex. A-1: PP. 292-95. Dr. Onabajo did not renew the Neurontin or Tramadol but informed Plaintiff that they may place him back on Baclofen when the Neurontin expired. Ex. A: ¶ 8; Ex. A-1: PP. 292-95.

On March 29, 2018, Plaintiff signed a receipt for a new wheelchair. Ex. A: ¶ 9; Ex. A-1: P. 173. Dr. Onabajo saw Plaintiff again on April 25, 2018 for a chronic care visit. Ex. A: ¶ 9; Ex. A-1: PP. 304-06. Plaintiff reported he was incarcerated since 1982 and was stabbed in his neck in 1997 and became a partial quadriplegic. Ex. A: ¶ 9; Ex. A-1: PP. 304-06. He stated he had developed pain in his right side, neck, ear, groin and lower back from degenerative disk disease and was treated for HCV in 2017. Ex. A: ¶ 9; Ex. A-1: PP. 304-06. Dr. Onabajo completed a physical exam and renewed Plaintiff's medications. Ex. A: ¶ 9; Ex. A-1: PP. 304-06.

On May 25, 2018, Plaintiff was brought to medical in a wheelchair after being found unresponsive and was sent to BWMC for suspected drug use. Ex. A: ¶ 10; Ex. A-1: PP. 307-09. On May 26, 2018, Plaintiff was evaluated at JRI after leaving BWMC. Ex. A: ¶ 10; Ex. A-1: PP. 311-12. Plaintiff reported he felt well and had no complaints. Ex. A: ¶ 10; Ex. A-1: PP. 311-12. Plaintiff saw Dr. Bishaw on May 27 and 28, 2018 during weekend rounds. Ex. A: ¶ 10; Ex. A-1: PP. 314-15, 319-20. Plaintiff had no acute complaints either day. Ex. A: ¶ 10; Ex. A-1: PP. 314-15, 319-20. On May 30, 2018, Plaintiff was discharged from JRI back to DRCF. Ex. A: ¶ 10; Ex. A-1: PP. 534-37.

Dr. Onabajo saw Plaintiff again on June 8, 2018 for provider chronic care. Ex. A: ¶ 11; Ex. A-1: PP. 542-45. Plaintiff was post treatment for HCV with history of neurogenic bladder, paraparesis, and admissions in the past for UTI, syncope, altered mental status, and recently for

chest pain. Ex. A: ¶ 11; Ex. A-1: PP. 542-45. His vitals were reviewed and labs were ordered. Ex. A: ¶ 11; Ex. A-1: PP. 542-45. Dr. Onabajo renewed and adjusted Plaintiff's medications. Ex. A: ¶ 11; Ex. A-1: PP. 542-45. He also submitted a consultation request for a Cardiology evaluation for a cardiac cath. Ex. A: ¶ 11; Ex. A-1: PP. 540-41.

A neurogenic bladder is a condition in which a patient lacks bladder control due to a brain, spinal cord, or nerve problem. Ex. A: ¶ 12. Signs and symptoms of neurogenic bladder may include loss of bladder control, inability to empty the bladder, urinary frequency, and UTIs. *Id.* Patients with neurogenic bladders often use clean intermittent catheterization (CIC), which involves inserting a thin tube through the urethra into the bladder several times during the day to empty the bladder. *Id.* Frequently inserting a catheter in this manner does increase the risk for UTIs. *Id.* Alternatively, a suprapubic catheter may be placed. *Id.* A suprapubic catheter is an indwelling, hollow, flexible tube inserted into the bladder through a small cut in the abdomen. *Id.* It is used to drain urine from the bladder and, in the management of bladder dysfunction, is often considered an alternative to a urethral catheter. *Id.* A suprapubic catheter is used when the urethra is damaged or blocked, or when a patient is unable to use an intermittent catheter. *Id.* Suprapubic catheters cause fewer UTIs and are generally more comfortable for the patients. *Id.*

On July 14, 2018, medical staff were called to Plaintiff's cell and he was found in the bathroom bleeding from his penis after urethral catheterization. Ex. A: ¶ 13; Ex. A-1: PP. 553-54. Pressure was applied and the bleeding stopped. Ex. A: ¶ 13; Ex. A-1: PP. 553-54. The on-call doctor was notified and ordered to give Plaintiff pain medication and observe him for an hour. Ex. A: ¶ 13; Ex. A-1: PP. 553-54. An hour after the medications were given, Plaintiff verbalized effectiveness of medication and no bleeding was observed. Ex. A: ¶ 13; Ex. A-1: PP. 553-54.

Dr. Onabajo saw Plaintiff for a follow up on July 16, 2018 for hematuria (blood in urine). Ex. A: ¶ 14; Ex. A-1: PP. 555-57. Plaintiff reported he was performing self-catheterization daily and hematuria had occurred that day, though it was much reduced from before. Ex. A: ¶ 14; Ex. A-1: PP. 555-57. He also reported lower abdominal pain for two days. Ex. A: ¶ 14; Ex. A-1: PP. 555-57. Dr. Onabajo assessed hematuria and ordered labs and medications including the antibiotic Ceftriaxone. Ex. A: ¶ 14; Ex. A-1: PP. 555-57.

On July 17, 2018, Plaintiff saw a nurse for complaints of bleeding from the penis for three days from using catheters. Ex. A: ¶ 15; Ex. A-1: PP. 558, 564-65. Dr. Onabajo then examined Plaintiff for his reported hematuria. Ex. A: ¶ 15; Ex. A-1: PP. 561-63. Labs were drawn and his urine was sent for a culture. Ex. A: ¶ 15; Ex. A-1: PP. 561-63. Plaintiff was started on the antibiotic Rocephin. Ex. A: ¶ 15; Ex. A-1: PP. 561-63. Dr. Onabajo referred him to the ED at BSH to be evaluated by Urology. Ex. A: ¶ 15; Ex. A-1: PP. 112-13, 564. The BSH discharge papers note that he was diagnosed with acute cystitis (inflammation of the bladder) with hematuria. Ex. A: ¶ 15; Ex. A-1: P. 99. Plaintiff was prescribed the antibiotic Bactrim for 7 days. Ex. A: ¶ 15; Ex. A-1: P. 111.

On August 18, 2018, Plaintiff saw RN Adria Sibilly with miscellaneous complaints. Ex. A: ¶ 16; Ex. A-1: PP. 578-79. A urine dipstick was done and was positive for blood, leukocytes, and ketones. Ex. A: ¶ 16; Ex. A-1: PP. 578-79. RN Sibilly noted that Plaintiff complained of bleeding and passing clots and was diaphoretic (excessively sweaty) after the urinalysis. Ex. A: ¶ 16; Ex. A-1: PP. 578-79. RNP Wondaye Deressa ordered one dose of Nubain (an opioid analgesic) and Motrin for pain. Ex. A: ¶ 16; Ex. A-1: PP. 578-79. She noted that she discussed the case with Dr. Oketunji and the decision was made to send Plaintiff to the BSH ER. Ex. A: ¶ 16; Ex. A-1: PP. 580-81. Plaintiff was admitted to BSH. Ex. A: ¶ 17; Ex. A-1: P. 849. On

August 20, 2018, urologist Dr. Laurence Scipio performed a cystoscopy, bladder biopsy, and fulguration of the bladder neck to stop the bleeding. Ex. A: ¶ 17; Ex. A-1: PP. 849-52. He diagnosed gross hematuria and left bladder neck trauma with bleeding. Ex. A: ¶ 17; Ex. A-1: PP. 849-52.

On August 21, 2018, Plaintiff saw PA Matthew Carpenter at JRI after being discharged from BSH. Ex. A: ¶ 18; Ex. A-1: PP. 582-83. PA Carpenter noted that Plaintiff had a cystoscopy which confirmed the diagnosis of bladder outlet trauma due to self-catheterization. Ex. A: ¶ 18; Ex. A-1: PP. 582-83. He was also diagnosed with a UTI and discharged with an order for oral antibiotics and a urology follow up as needed. Ex. A: ¶ 18; Ex. A-1: PP. 582-83. His Foley catheter was removed and he was able to self-catheterize without difficulty. Ex. A: ¶ 18; Ex. A-1: PP. 582-83. Plaintiff then returned to DRCF. Ex. A: ¶ 18; Ex. A-1: P. 584.

On August 23, 2018, Plaintiff saw RN Shirly Devadas for complaints of abdominal pain and hematuria. Ex. A: ¶ 19; Ex. A-1: PP. 592-93. RN Devadas noted that he was sweating profusely. Ex. A: ¶ 19; Ex. A-1: PP. 592-93. She attempted to start an IV line but was unsuccessful. Ex. A: ¶ 19; Ex. A-1: PP. 592-93. She called Dr. Onabajo who then saw Plaintiff. Ex. A: ¶ 19; Ex. A-1: PP. 596-97. Dr. Onabajo noted Plaintiff was just released after an admission to BSH for gross hematuria and UTI two days ago and discharged on Cipro. Ex. A: ¶ 19; Ex. A-1: PP. 596-97. This morning he again presented with another episode of gross hematuria with severe lower abdominal pain and sweating profusely with no nausea, vomiting, or chest pain. Ex. A: ¶ 19; Ex. A-1: PP. 596-97. Dr. Onabajo ordered to send him back to the hospital for further evaluation. Ex. A: ¶ 19; Ex. A-1: PP. 596-97.

On August 23, 2018, Plaintiff was admitted to BSH with diagnoses of gross hematuria and paraplegia. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. Plaintiff reported that he tried to catheterize

himself and noted heavy bleeding. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. The BSH record noted that Dr. Scipio irrigated the bladder and diagnosed traumatic injury to the ureter. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. Dr. Scipio had started Plaintiff on Amicar and kept the Foley catheter. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. On August 24, 2018, Dr. Asresahegn Getachew noted that Plaintiff had no bleeding that morning when he saw him at BSH and he was on the antibiotic Cipro for a suspected UTI. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. He also noted that a urine culture done during his previous admission showed he had Klebsiella pneumoniae, which is resistant to ciprofloxacin. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. He noted that he would consult with Dr. Atnafu, the infectious disease specialist. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. Dr. Getachew also noted that the urologist recommended to keep the catheter for one week and continue antibiotics. Ex. A: ¶ 20; Ex. A-1: PP. 125-26. The discharge diagnosis was traumatic injury to the bladder and ureter due to self-catheterization. Ex. A: ¶ 20; Ex. A-1: PP. 125-26.

On August 24, 2018, Plaintiff was discharged from BSH and admitted to the JRI infirmary. Ex. A: ¶ 21; Ex. A-1: PP. 117, 144. On August 25, 2018, Plaintiff saw Dr. Sisay. Ex. A: ¶ 22; Ex. A-1: PP. 605-06. Dr. Sisay noted Plaintiff wanted pain medication, and he continued the Bactrim and prescribed Extra Strength Tylenol. Ex. A: ¶ 22; Ex. A-1: PP. 605-06. On August 26, 2018, Plaintiff saw Dr. Bishaw during weekend rounds. Ex. A: ¶ 22; Ex. A-1: PP. 611-12. Plaintiff reported no fever or bleeding, and Dr. Bishaw continued his medications and treatment plan. Ex. A: ¶ 22; Ex. A-1: PP. 611-12. On August 27, 2018, PA Matthew Carpenter submitted a consultation request to BSH Urology to follow up on urethral damage due to self-catheterization. Ex. A: ¶ 22; Ex. A-1: P. 476.

On September 1, 2018, Plaintiff saw Dr. Sisay. Ex. A: ¶ 23; Ex. A-1: PP. 643-44. Dr. Sisay noted Plaintiff wanted Percocet increased because of reported dysuria. Ex. A: ¶ 23; Ex. A-

1: PP. 643-44. He was awaiting a Urology evaluation. Ex. A: ¶ 23; Ex. A-1: PP. 643-44. Dr. Sisay prescribed pyridium, a medication used to treat UTI symptoms. Ex. A: ¶ 23; Ex. A-1: PP. 643-44. On September 2 and 3, 2018, Plaintiff saw Dr. Bishaw during weekend rounds. Ex. A: ¶ 23; Ex. A-1: PP. 649-50, 654-55. Dr. Bishaw noted Plaintiff had no hematuria, fever, or chills and continued his medications. Ex. A: ¶ 23; Ex. A-1: PP. 649-50, 654-55.

On September 7, 2018, Plaintiff returned to urologist Dr. Scipio for a follow up. Ex. A: ¶ 24; Ex. A-1: PP. 470-74. Dr. Scipio noted Plaintiff was doing well, reported no pain, and had no complaints. Ex. A: ¶ 24; Ex. A-1: PP. 470-74. His indwelling catheter was draining well but the urine was dark amber because of the pyridium medication. Ex. A: ¶ 24; Ex. A-1: PP. 470-74. Dr. Scipio assessed (1) gross hematuria; (2) neurogenic bladder; (3) UTI associated with cystostomy catheter; and (4) trauma of urethra. Ex. A: ¶ 24; Ex. A-1: PP. 470-74. He recommended placement of a suprapubic catheter, but Plaintiff refused. Ex. A: ¶ 24; Ex. A-1: PP. 470-74. He then recommended continuing present management but cautioned that hematuria may reoccur with self-catheterization. Ex. A: ¶ 24; Ex. A-1: PP. 470-74.

On September 8, 2018, Plaintiff saw Dr. Sisay and reported he saw the urologist the day before and he had recommended a suprapubic catheter. Ex. A: ¶ 25; Ex. A-1: PP. 676-77. Plaintiff stated that his Percocet stopped and he wanted pain medication. Ex. A: ¶ 25; Ex. A-1: PP. 676-77. Dr. Sisay ordered Tylenol and continued the treatment plan. Ex. A: ¶ 25; Ex. A-1: PP. 676-77. On September 9, 2018, Plaintiff saw Dr. Bishaw during weekend rounds. Ex. A: ¶ 25; Ex. A-1: PP. 681-82. Plaintiff was in no distress and had no fever or chills, and Dr. Bishaw continued current treatment. Ex. A: ¶ 25; Ex. A-1: PP. 681-82. On September 10, 2018, Plaintiff transferred from JRI back to DRCF. Ex. A: ¶ 25; Ex. A-1: P. 688.

Dr. Onabajo saw Plaintiff on September 14, 2018 for a chronic care visit. Ex. A: ¶ 26; Ex. A-1: PP. 703-06. He noted that Plaintiff was just released back to population after a short stay in the infirmary on returning from BSH where he was admitted for hematuria (recurrent) from trauma to his urethra, though he was offered a suprapubic catheter and declined. Ex. A: ¶ 26; Ex. A-1: PP. 703-06. Plaintiff had no complaints and Dr. Onabajo informed him that he would be following up with Dr. Scipio and continue his medications. Ex. A: ¶ 26; Ex. A-1: PP. 703-06.

On October 5, 2018, Plaintiff returned to BSH to see Dr. Scipio. Ex. A: ¶ 27; Ex. A-1: PP. 482-86, 855-56. Dr. Scipio diagnosed (1) neurogenic bladder, (2) acute cystitis with hematuria, and (3) urethral trauma and instructed Plaintiff to return if symptoms worsened or failed to improve. Ex. A: ¶ 27; Ex. A-1: PP. 482-86, 855-56. Plaintiff reported no pain and had no new complaints, and Dr. Scipio noted that he was performing intermittent self-catheterizations. Ex. A: ¶ 27; Ex. A-1: PP. 482-86, 855-56. Dr. Onabajo saw Plaintiff again on October 9, 2018 and discussed the advantages and disadvantages of a suprapubic catheter with him. Ex. A: ¶ 27; Ex. A-1: PP. 714-16. He also noted that Plaintiff's hematuria was now resolved. Ex. A: ¶ 27; Ex. A-1: PP. 714-16.

Dr. Onabajo saw Plaintiff on December 7, 2018 for chronic care. Ex. A: ¶ 29; Ex. A-1: PP. 727-30. Plaintiff complained of pain in his groin/hip area, but an x-ray of his right hip showed only moderate degenerative joint disease. Ex. A: ¶ 29; Ex. A-1: PP. 727-30. He wanted the nerve pain medication Neurontin increased but was given increased Baclofen (a muscle relaxer) instead and advised to take more of it while his other medications were renewed. Ex. A: ¶ 29; Ex. A-1: PP. 727-30.

On January 1, 2019, Corizon Health Inc. replaced Wexford Health as the contracted medical care provider. Ex. A: ¶ 30. Dr. Onabajo saw Plaintiff on March 6, 2019 for chronic care.

Ex. A: ¶ 33; Ex. A-1: PP. 749-52. Plaintiff requested an increase in Neurontin because he was having breakthrough pain in the late afternoons. Ex. A: ¶ 33; Ex. A-1: PP. 749-52. Dr. Onabajo offered Tylenol Extra Strength but he refused it and wanted Neurontin 600 mg three times per day (TID). Ex. A: ¶ 33; Ex. A-1: PP. 749-52. Dr. Onabajo explained that the x-rays of his right hip showed moderate DJD and that would explain all his symptoms. Ex. A: ¶ 33; Ex. A-1: PP. 749-52. Although Plaintiff wanted Neurontin increased, Dr. Onabajo advised him to take more of the Baclofen for now while his other medications were renewed. Ex. A: ¶ 33; Ex. A-1: PP. 749-52. Plaintiff also wanted his Ensure nutritional supplements renewed and Dr. Onabajo changed his diet to a high calorie diet. Ex. A: ¶ 33; Ex. A-1: PP. 749-52. He performed an examination and noted muscle wasting in the extremities and visible back/extremities deformities. Ex. A: ¶ 33; Ex. A-1: PP. 749-52. Dr. Onabajo assessed HCV and joint pain in multiple sites and renewed Plaintiff's medications. Ex. A: ¶ 33; Ex. A-1: PP. 749-52.

On April 3, 2019, Plaintiff had a urinalysis which showed many bacteria. Ex. A: ¶ 34; Ex. A-1: P. 95. Dr. Onabajo saw Plaintiff again on April 8, 2019 for an assessment. Ex. A: ¶ 34; Ex. A-1: PP. 756-59. He reviewed his recent lab results with him, started him on Bactrim DS, and ordered a urine culture. Ex. A: ¶ 34; Ex. A-1: PP. 756-59. On examination, Plaintiff was positive for focal weakness, gait disturbance, right sided pain from the injury to his neck, and right sided paresthesia. Ex. A: ¶ 34; Ex. A-1: PP. 756-59. Dr. Onabajo assessed right-sided pain from the injury to his neck. Ex. A-1: PP. 756-59.

On May 8, 2019, Plaintiff had a urine culture, which showed no growth. Ex. A: ¶ 35; Ex. A-1: P. 859. Dr. Onabajo saw Plaintiff on May 10, 2019, reviewed his urine culture with him, and reviewed and renewed his medications. Ex. A: ¶ 35; Ex. A-1: PP. 760-65. Plaintiff wanted his Gabapentin dosage increased and this was pending approval by the Regional Medical

Director. Ex. A: ¶ 35; Ex. A-1: PP. 760-65. Based on Dr. Onabajo's review of the medical records, this was the last time he saw Plaintiff or had any involvement with his care. Ex. A: ¶ 35. On August 23, 2019, Plaintiff transferred from DRCF to WCI. Ex. A: ¶ 36; Ex. A-1: P. 19.

It is Dr. Onabajo's opinion within a reasonable degree of medical certainty that the care and treatment Plaintiff received for his frequent UTIs has been appropriate. Ex. A: ¶ 37. He has consistently been prescribed antibiotics and pain relievers, and also received pyridium for a time to treat the symptoms. Id. Plaintiff's frequent UTIs were not caused by the "filthy conditions" at DRCF as he claims, but rather due to his need to catheterize himself multiple times per day due to his neurogenic bladder. Id. There is a risk of a UTI any time Plaintiff places a catheter into his urethra because he is placing a foreign object inside his body and introducing bacteria each time. Id. Although placement of a suprapubic catheter would eliminate the need to self-catheterize and reduce the risk of UTIs, Plaintiff has refused to have the procedure. Id. Accordingly, he will likely continue to get UTIs. Id.

It is Dr. Onabajo's opinion, within a reasonable degree of medical certainty that the care and treatment Plaintiff received for his hematuria was appropriate. Ex. A: ¶ 38. The bleeding was caused by Plaintiff injuring his bladder neck while self-catheterizing. Id. Plaintiff was sent out to the hospital multiple times for the bleeding and urologist Dr. Scipio performed a cystoscopy, bladder biopsy, and fulguration of the bladder neck to stop the bleeding on August 18, 2018. Id.

## II. LEGAL ARGUMENT

### A.    Motions to Dismiss

As to a 12(b)(6) motion to dismiss, a plaintiff fails to state a claim when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). This requirement "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

The Supreme Court has held that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations and quotation marks omitted). However, the Fourth Circuit has "not read *Erickson* to undermine *Twombly's* requirement that a pleading contain more than labels and conclusions." *Giarratano v. Johnson*, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (internal quotation marks omitted) (applying *Twombly* standard in dismissing pro se complaint); *accord Atherton v. Dist. of Columbia Off. of Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009) ("A *pro se* complaint ... 'must be held to less stringent standards than formal pleadings drafted by lawyers.' But even a *pro se* complainant must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'") (quoting *Erickson*, 551 U.S. at 94 and *Iqbal*, 556 U.S. at 679).

**B.      Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate against a plaintiff who fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear

the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Failure to demonstrate a genuine issue for trial will result in summary judgment. *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 951 (4th Cir. 1995).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court may rely on only facts supported in the record, not simply assertions in the pleadings, to fulfill its "affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). "Unsupported speculation is not sufficient to defeat a summary judgment motion." *Id.* (citing *Ash v. United Parcel Serv.*, 800 F.2d 409, 411-12 (4th Cir. 1986)).

## C.    Deliberate Indifference Claims Under 42 U.S.C. § 1983

Federal claims by prisoners that they received constitutionally deficient medical care in violation of the Eighth Amendment are governed by the deliberate indifference standard. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* The "deliberate indifference" standard is made up of (1) an objective component requiring that the pain or condition be sufficiently serious; and (2) a subjective component requiring that the offending officials acted with a sufficiently culpable state of mind. *Id.* at 104-06. The objective component is satisfied by a serious medical condition and the subjective component is satisfied by showing deliberate indifference by prison officials. *Johnson*

*v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). "[A] 'serious ... medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

"[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). It requires that a prison official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison official is not deliberately indifferent if she did not actually draw the inference that the prisoner was exposed to a specific risk of harm. *Id.* at 844; *see also Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Indeed, absent subjective knowledge, a prison official is not liable even "if the risk was obvious and a reasonable prison official would have noticed it." *Farmer*, 511 U.S. at 842.

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *accord Johnson*, 145 F.3d at 168. "Nor does a prisoner's disagreement with medical personnel over the course of his treatment make out a cause of action." *Taylor v. Bennett*, 105 F. Supp.2d 483, 487 (E.D. Va. 2000) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

Officials can only be held liable for their own conduct. *Iqbal*, 556 U.S. at 676-77; *see also Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014) ("[S]upervisors may not be held liable under 42 U.S.C. § 1983 for actions of subordinate employees unless the supervisors have

'direct culpability' in causing the plaintiff's injuries.") (citing *McWilliams v. Fairfax Cnty. Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir. 1996)), *abrogated on other grounds by Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.").

There is no *respondeat superior* liability under 42 U.S.C. § 1983, and local governments or corporations performing a functionally traditionally performed by the government may not be sued under § 1983 simply for employing a tortfeasor. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Baker v. Lyles*, 904 F.2d 925, 929 (4th Cir. 1990).

> "Although the 'principles of § 1983 policy-maker liability were articulated in the context of suits brought against municipalities and other local government defendants,' they 'are equally applicable to a private corporation acting under color of law when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights.'"

*Safar v. Corizon, Inc.*, No. GJH-16-3277, 2018 WL 6505499, at *6 (D. Md. Dec. 11, 2018) (unpublished) (quotations omitted); *see also Fields v. Corizon Health, Inc.*, 490 Fed. App'x. 174, 181-182 (11th Cir. 2012) (finding that private entity providing medical services to inmates served a state function and could be held liable under § 1983).

Plaintiffs suing under § 1983 seeking to impose liability on a municipality must adequately plead and prove the existence of an official policy or custom "that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). Similarly, "private corporations can only be held liable under § 1983 if 'an official policy or custom of the corporation causes the alleged deprivation of federal rights.'" *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348,

355 (4th Cir. 2003) (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999)).

**D.      Plaintiff Fails to State a Claim Against Corizon Defendants**

      *1.      Corizon*

In his Complaint and Supplement, Plaintiff does not include any specific allegations against Corizon. *See* CM/ECF No. 1, 5. He does not mention any custom or policy, let alone allege that any Corizon custom or policy was the moving force behind any constitutional violation. *See id.* Plaintiff has failed to adequately plead the existence of an official policy or custom attributable to Corizon that proximately caused the deprivation of his rights, and he has thus failed to state a claim upon which relief may be granted. Accordingly, Corizon must be dismissed. *See Rodriguez*, 338 F.3d at 355; *Jordan by Jordan*, 15 F.3d at 338.

      *2.      Dr. Onabajo, Dr. Getachew, Dr. Sisay, Dr. Bishaw*

Like with Corizon, Plaintiff does not include any specific allegations against Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw. CM/ECF No. 1, 5. He generally alleges that he developed UTIs and blood clots in his bladder due to "filthy conditions" at DRCF. *See id.* However, there is no allegation that any of the individual defendants was responsible for the cleanliness of the facility's dorms, bathrooms, or showers. Defendants cannot be liable for the acts or omissions of others under § 1983. *See Iqbal*, 556 U.S. at 676-77. In his Supplement, Plaintiff alleges that he was sent back and forth to the hospital due to bleeding and blood clots in his bladder, but makes no allegation regarding the care provided by the individual defendants. *See* CM/ECF No. 5. Neither Plaintiff's Complaint nor Supplement raises any specific allegations against any of the individual defendants or alleges they were deliberately indifferent to Plaintiff's medical needs. *See* CM/ECF No. 1, 5.

Although Plaintiff is proceeding *pro se*, a "liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a cognizable claim." *Adams v. Stewart*, No. ELH-18-3420, 2020 WL 2793984, at *3 (D. Md. May 28, 2020) (Slip Copy) (citations omitted). "Moreover, a federal court may not act as an advocate for a self-represented litigant." *Id.* (citations omitted). "Therefore, the court cannot fashion claims for a plaintiff because he is self-represented." *Id.*

> As the Fourth Circuit has said: "To do so would not only strain judicial resources by requiring those courts to explore exhaustively all potential claims of a pro se plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party."

*Id.* (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Plaintiff attaches ARPs to his Complaint wherein he complained that he had not timely received catheters or seen a doctor, but none of those ARPs mentions Corizon, Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw. *See* CM/ECF No. 1-2. Thus, they do not help to state a claim against Corizon Defendants. *See Adams*, 2020 WL 2793984 at *10 (finding that a plaintiff's claim that he arrived at a halfway house without his medication failed to state a claim against the defendants because he did "not specifically claim that any of the named defendants purposely or recklessly failed to insure he had an adequate supply of medication with him when he was released to the halfway house"). As in *Adams*, Plaintiff does not allege that Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw purposely or recklessly failed to insure that he had a supply of catheters after he arrived at WCI from DRCF or was responsible for scheduling appointments with providers. *See* CM/ECF No. 1, 5. In any event, because the ARPs are not mentioned in or incorporated into the Complaint, this Court should not consider them when seeking to determine if Plaintiff has stated a claim. *See Adams*, 2020 WL 2793984 at *4 ("[T]he

court ordinarily 'may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]'") (quoting *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015)).

Here, Plaintiff's Complaint and Supplement simply include no factual allegations sufficient to state a claim against Corizon, Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw. Accordingly, this Court should dismiss Plaintiff's Complaint for failure to state a claim.

**E.     Defendants are Entitled to Summary Judgment**

Even assuming that Plaintiff stated a claim against Corizon Defendants, they are still entitled to summary judgment. The Declaration of Dr. Bolaji Onabajo, attached hereto as Exhibit A, and a true and correct copy of Plaintiff's relevant medical records, attached to Dr. Onabajo's Declaration as Exhibit A-1, show that Plaintiff received constitutionally adequate medical care.[2]

As an initial matter, Corizon Defendants do not dispute that Plaintiff's bladder issues including hematuria and frequent UTIs due to his neurogenic bladder constitute objectively serious medical needs. *See Iko*, 535 F.3d at 241. However, the medical records demonstrate that Corizon Defendants were not deliberately indifferent to those needs.

*1.     Corizon*

Corizon became the contracted health care provider on January 1, 2019, and cannot be held responsible for any alleged violations that occurred prior to that date. Ex. A: ¶ 30. In any event, no Corizon policy, practice, or custom led to a violation of Plaintiff's Eighth Amendment

---

[2] "In determining whether a prisoner has received adequate medical treatment, this Court is entitled to rely on the affidavits of medical personnel and prison medical records kept in the ordinary course of operation." *Bennett v. Reed*, 534 F. Supp. 83, 86 (E.D.N.C. 1981), *aff'd*, 676 F.2d 690 (4th Cir. 1982). When "it appears from the entire record that the prison medical authorities have made a sincere and reasonable effort to handle plaintiff's medical problems, plaintiff's constitutional rights have not been violated pursuant to 42 U.S.C. § 1983." *Id.* at 87.

rights. As noted above, Plaintiff fails to state a claim against Corizon. He fails to identify any policy, custom, or procedure of Corizon which caused him harm, and instead apparently seeks to hold Corizon liable for the acts or omissions of its medical providers through the doctrine of *respondeat superior*. *See generally* CM/ECF No. 1, 5. However, this is not permitted under § 1983. *See Monell*, 436 U.S. at 691.

Plaintiff's claim further fails because, as shown below, he cannot establish that Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw violated his constitutional rights. *See Jackson v. Pena*, 28 F. Supp.3d 423, 433 (D. Md. 2014) (finding that the plaintiff failed to satisfy the prerequisite to a sufficient *Monell claim*, that his constitutional rights were violated by the Baltimore Police Department's employees). The evidence and argument below thus demonstrate no violation of Plaintiff's constitutional rights. With no underlying constitutional violation, Corizon cannot be liable. Accordingly, Plaintiff's claims against Corizon must be dismissed.

2.      *Dr. Onabajo, Dr. Getachew, Dr. Sisay, Dr. Bishaw*

Plaintiff has not included any factual allegations against Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw in his Complaint or Supplement. *See* CM/ECF No. 1, 5. Thus, they should be dismissed on that basis alone. However, a review of the medical records shows that these individual defendants were not deliberately indifferent to Plaintiff's bladder issues.

First, the evidence shows that Plaintiff has not seen Dr. Getachew, Dr. Sisay, or Dr. Bishaw since Corizon became the contracted health care provider on January 1, 2019. It appears Plaintiff last saw Dr. Getachew at Bon Secours Hospital on August 24, 2018, Dr. Sisay at JRI on September 8, 2018, and Dr. Bishaw on September 9, 2018 at JRI. Ex. A: ¶¶ 21, 25. Thus, even if Corizon could be liable for the actions of its employees under *respondeat superior*, which it

cannot, Dr. Getachew, Dr. Sisay, and Dr. Bishaw appear to have had no interactions with Plaintiff under Corizon's tenure.

In any event, there is no evidence that Dr. Getachew, Dr. Sisay, or Dr. Bishaw were deliberately indifferent to Plaintiff's bladder issues. Dr. Getachew saw Plaintiff at BSH on August 24, 2018 after his visit with urologist Dr. Scipio, performed a thorough examination, and ensured that Plaintiff was prescribed an appropriate antibiotic for his UTI. Ex. A: ¶¶ 20-21. Dr. Sisay and Dr. Bishaw saw Plaintiff at JRI after his discharges from the hospital but before he returned to his regular prison facility. In that capacity, they ensured that treatment recommendations from the hospitals were being carried out and they addressed his various complaints. Ex. A: ¶¶ 7, 10, 22-23, 25. There is no evidence that any of these providers were deliberately indifferent.

Second, the medical records show that Dr. Onabajo was not deliberately indifferent. Dr. Onabajo saw Plaintiff throughout 2018 at DRCF and performed examinations, prescribed appropriate medications, and sent Plaintiff to the hospital when he believed it necessary. Ex. A: ¶¶ 8-9, 11, 14-15, 19, 26-27, 29. He then saw Plaintiff on April 8, 2019 after a urinalysis showed bacteria. Ex. A: ¶ 34. Dr. Onabajo reviewed the results with Plaintiff and started him on Bactrim for the UTI. *Id.* Dr. Onabajo saw Plaintiff for the last time on May 10, 2019 when he reviewed and renewed his medications. Ex. A: ¶ 35. To the extent Plaintiff disagrees with the treatment provided by Dr. Onabajo, such a disagreement falls short of showing deliberate indifference. *See Wright*, 766 F.2d at 849; *Taylor*, 105 F. Supp.2d at 487. And to the extent Plaintiff alleges Dr. Onabajo was negligent in the treatment provided, such a claim is not actionable under § 1983. *See Estelle*, 429 U.S. at 106.

Finally, Dr. Onabajo has testified in his declaration that that the care and treatment Plaintiff received for his frequent UTIs and hematuria was appropriate. Ex. A: ¶¶ 37-38. The medical records show that Plaintiff's hematuria and bladder neck injury was caused by his self-catheterizations. Plaintiff was sent out to the hospital multiple times when the providers observed bleeding from his penis and urethra. Urologist Dr. Scipio ultimately performed a cystoscopy, bladder biopsy, and fulguration of the bladder neck which stopped the bleeding. Ex. A: ¶ 17. By October 5, 2018, Plaintiff's hematuria was resolved. Ex. A: ¶ 27.

Plaintiff complains in his Supplement that he still has bladder problems. CM/ECF No. 5, P. 2. These problems are due to Plaintiff's neurogenic bladder, a permanent condition in which he lacks bladder control due to a brain, spinal cord, or nerve problem. Ex. A: ¶ 12; *see also* Ex. A: ¶ 9 (Plaintiff reported he was stabbed in the neck in 1997 and became a partial quadriplegic). Because Plaintiff has a neurogenic bladder, he must either use clean intermittent catheterization on himself or have placement of a suprapubic catheter. *Id.* Dr. Scipio recommended a suprapubic catheter for Plaintiff, but he refused. Ex. A: ¶ 24. Dr. Scipio cautioned Plaintiff that hematuria may reoccur with self-catheterization. *Id.* Thus, Plaintiff's bladder problems have not been caused or exacerbated by Dr. Onabajo, Dr. Getachew, Dr. Sisay, or Dr. Bishaw but are due to his neurogenic bladder and continued self-catheterization.

The undisputed medical records show that Dr. Onabajo, Dr. Getachew, Dr. Sisay, and Dr. Bishaw were not deliberately indifferent to Plaintiff's bladder issues. Accordingly, should this Court find that Plaintiff stated a claim against them, it should nevertheless grant summary judgment in their favor.

22

### III.  <u>CONCLUSION</u>

Corizon Defendants respectfully request that Plaintiff's suit against them be dismissed for failure to state a claim or, since no dispute of material fact exists, that summary judgment be entered in their favor.

Submitted this 2nd day of July 2020.

Respectfully submitted,

**MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C.**

By: */s/ Alexandra R. Hilton*
    Patricia H. Beall
    Bar Number: 29593
    PBeall@moodklaw.com
    Alexandra R. Hilton
    Bar Number: 21233
    Ahilton@moodklaw.com
    600 Baltimore Avenue, Suite 305
    Towson, Maryland  21204
    (410) 339-6880
    *Attorneys for Corizon Health, Inc., Dr. Bolaji Onabajo, Dr. Asresahegn Getachew, Dr. Yonas Sisay, and Dr. Hiruy Bishaw*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 2nd day of July 2020, a copy of the foregoing document

was electronically transmitted to this Court and mailed first class, postage pre-paid to:

Marc S. Cason
#180571/160904
Western Correctional Institution
13800 McMullen Highway, SW
Cumberland, MD 21502
*Pro Se Plaintiff*

***<u>Via Email:</u>***
Gina Marie Smith
Douglas Conrad Meister
Meyers Rodbell and Rosenbaum PA
6801 Kenilworth Avenue, Suite 400
Riverdale, MD 20737-1385
Email: gsmith@mrrlaw.net; dmeister@mrrlaw.net

*/s/ Alexandra R. Hilton*
Alexandra R. Hilton

855230v.1