## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARC S. CASON,                          *

Plaintiff                               *

v                                       *          Civil Action No. PX-20-692

CORIZON HEALTH INC.,                    *
MARYLAND DIVISION OF
   CORRECTIONS,                         *
BON SECOURS HOSPITAL,
DR. BOLAJI ONABAJO,                     *
ASRESAHEGN GETACHEW,
DR. LAWRENCE H. SCIPIO,                 *
DR. AYOKU OKETUNJI,
DR. YONAS SISAY,                        *
DR. HIRUY BISHAW,
                                 *

Defendants
                                 ***

## MEMORANDUM OPINION

Marc S. Cason brings this action against Corizon Health Inc., Dr. Bolaji Onabajo, Dr. Asresahegn Getachew, Dr. Yonas Sisay, and Dr. Hiruy Bishaw (collectively, the "Corizon Defendants"), Dr. Ayoku Oketunji,[1] the Maryland Division of Corrections ("DOC"), Bon Secours Hospital, and Dr. Lawrence H. Scipio.[2]   Cason avers that each violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and provided him inadequate medical care while he had been incarcerated in DOC facilities.   ECF Nos. 1, 5.   Cason has not perfected service against

---

[1] Oketunji, Onabajo, Getachew, Sisay, and Bishaw were employed by Wexford Health Sources, which was the contracted medical provider for inmates in the Maryland Department of Public Safety and Correctional Services until December 31, 2018.   Beginning January 1, 2019, Corizon Health replaced Wexford, and defendants Onabajo, Getachew, Sisay, and Bishaw continued to provide medical services on behalf of Corizon.   Accordingly, claims related to events that predated January 1, 2019 are against the "Wexford Defendants."   All claims regarding events after that date will be considered against the "Corizon Defendants".

[2] The Clerk shall amend the docket to correct the names of Defendants Corizon Health, Inc., Dr. Bolaji Onabajo, Dr. Ayoku Oketunji, Dr. Yonas Sisay, and Dr. Hiruy Bishaw.

Bon Secours and Dr. Scipio; the DOC has moved to dismiss the complaint (ECF No. 19), and the Corizon and Wexford Defendants have filed motions to dismiss or alternatively for summary judgment to be granted in their favor (ECF Nos. 17, 22). Cason responded to Defendants' motions (ECF Nos. 27, 28, 29), to which the Corizon and Wexford Defendants replied (ECF Nos. 31, 32). Cason also filed a motion for default judgment as to Bon Secours, Dr. Scipio, and the DOC. ECF Nos. 30, 39.

The matter is now ripe for review, with no need for a hearing. *See* Loc. R. 105.6. For the reasons that follow, Cason's claims against Bon Secours and Dr. Scipio ARE DISMISSED without prejudice. The Corizon and Wexford Defendants' motions, construed as motions for summary judgment, as well as the DOC's motion to dismiss, ARE GRANTED. Cason's motion for default judgment IS DENIED.

## I.      Background

The Complaint facts, viewed as true and most favorably to Cason, are as follows. While incarcerated at Dorsey Run Correctional Facility ("DRCF") from March 5, 2018 until August 23, 2019, Cason "suffered because of wheelchair inaccessibility, filthy dormitory and bathroom, [and] shower conditions." ECF No. 1 at 2. Beginning July 16, 2018 until August 26, 2018, he suffered from "severe bladder and urinary tract infections." ECF No. 5 at 3. As a result, Cason was hospitalized for blood clots in his bladder and received inadequate medical attention thereafter. ECF No. 1 at 2.

Incorporated into the Complaint are Administrative Remedy Procedure request forms ("ARPs") that Cason had submitted as part of the prison grievance procedure. ECF No. 1-2. In one ARP, Cason complained that the Maryland Department of Public Safety and Correctional Services ("DPSCS") and the Warden of DRCF failed to provide reasonable accommodations as

required by the ADA and the American Correctional Association standards. *Id.* at 6. Specifically, he claimed that the showers lacked appropriate grab rails, a shower hose or adjustable shower seats; the toilet was not the appropriate height; cells lacked appropriate spacing between bunks for wheelchairs; exterior doorways had thresholds that made it difficult to cross for wheelchair-bound inmates; the weight pit was unsafe to use with a wheelchair; and tables in the facility were not handicap accessible. *Id.* at 7. The Warden found the ARP to be meritorious in part, and he informed Cason that modifications to existing showers, lavatories, and toilets were warranted. *Id.* at 5. The Warden also indicated that the weight pit access needed improvement, and that modifications would be made to facility tables. *Id.* The Warden found, however, that exterior door thresholds complied with the relevant policies. *Id.*

A second ARP reflects that on August 23, 2019, Cason was transferred from DRCF to Western Correctional Institution ("WCI") without any of his property, including medically necessary catheters. *Id.* at 1-2. Accordingly, because he was forced to use the same catheter for over a week, had developed a urinary tract infection ("UTI") requiring medical attention. *Id.* That ARP request was found meritorious in part. Cason was belatedly evaluated by a medical provider on September 22, 2019, and at that point, his medications and additionally catheters were reordered. *Id.* at 3-4.

Corizon Defendants have submitted Cason's medical records and other documents which, in summary, establish Cason's medical history and recent difficulties.[4] *See* ECF No. 17. Cason, a wheelchair-bound paraplegic, suffers from Hepatitis C, neurogenic bladder,[5] chronic pain,

---

[4] The Wexford Defendants adopted the Corizon Defendants' motion. ECF No. 22.

[5] A neurogenic bladder is a condition in which a patient lacks bladder control due to a brain, spinal cord, or nerve problem. ECF No. 17-3 ¶ 12. Signs and symptoms of neurogenic bladder may include loss of bladder control, inability to empty the bladder, urinary frequency, and UTIs. *Id.* Patients with neurogenic bladders often use clean intermittent catheterization, which involves inserting a thin tube through the urethra

anemia, and major depressive disorder. *See* ECF No. 17-6 at 44; ECF No. 17-9 at 86. On Saturday, July 14, 2018, a nurse found Cason in the bathroom bleeding from his penis after urethral catheterization. ECF No. 17-9 at 53. Cason explained that the same thing happened on two prior occasions. *Id.* The nurse applied pressure to stop the bleeding. Cason was then placed on observation and administered pain medication. *Id.* Once the bleeding ceased and Cason's pain subsided, the nurse discharged Cason to his housing unit with follow up instructions. *Id.*

On Monday, July 16, 2018, Dr. Onabajo saw Cason at the DRCF medical unit as Cason's follow-up. *Id.* at 55-57. Cason reported that he had been performing self-catheterization daily and had lower abdominal pain for two days in addition to chills and nights sweats. *Id.* Dr. Onabajo prescribed an antibiotic, ordered blood and urine tests, and directed Cason to follow up if his condition worsened or did not improve within 14 days. *Id.* at 56-57.

The following morning, Cason returned to the medical unit, once again bleeding from his penis. *Id.* at 58. Dr. Onabajo examined Cason, consulted with another provider, then referred Cason to the emergency department at Bon Secours for a urology consultation. *Id.* at 59-62. By noon that same day, Cason was transported to Bon Secours. *Id.* at 64. An emergency provider at the hospital diagnosed Cason with acute cystitis (inflammation of the bladder) and hematuria, prescribed the antibiotic Bactrim, and directed him to follow up with a urologist within one day. ECF No. 17-4 at 99-100. Cason returned to DRCF later that evening, acknowledging that he felt "so much better," and that he had received antibiotics and pain medication. ECF No. 17-9 at 68.

On July 27, 2018, Cason reported to the DRCF medical unit for a chronic care visit with Dr. Onabajo. *Id.* at 70. At that time, Dr. Onabajo reviewed Cason's medication and urine culture and discussed them with him. *Id.* at 71.

---

into the bladder several times during the day to empty the bladder. *Id.* Frequently inserting a catheter in this manner increases the risk for UTIs. *Id.*

Cason did not return to the medical unit until August 18, 2018, when he complained of abdominal pain, bloody urine, and excessive sweating. *Id.* at 78-79. Testing revealed that Cason had blood in his urine and other signs of infection. *Id.* He received pain medication and, after consultation with Dr. Oketunji, was transported to the Bon Secours emergency room for evaluation and treatment. *Id.* at 80.

At Bon Secours, Dr. Scipio diagnosed Cason with gross hematuria and left bladder neck trauma with bleeding. *Id.* at 86; ECF No. 17-12 at 49-52. On August 20, 2018, Dr. Scipio performed a cystoscopy, bladder biopsy, and took steps to repair Cason's bladder neck to stop the bleeding. *Id.* Following the procedure, Cason was offered a suprapubic catheter,[6] but chose a Foley catheter instead. ECF No. 17-9 at 86.

On August 21, 2018, Cason returned to DRCF after having been diagnosed with another UTI and having received antibiotics. *Id.* at 82-84. The Foley catheter was removed and Cason was able to self-catheterize without difficulty. *Id.* But just two days later, on August 23, 2018, Cason returned to the DRCF medical unit, sweating profusely, with complaints of abdominal pain and hematuria. *Id.* at 92-93. The nurse on duty attempted to start an IV line but was unsuccessful. *Id.* Cason was transported to Bon Secours, where Dr. Scipio diagnosed him with traumatic injury to the ureter due to self-catheterization. ECF No. 17-5 at 25. Dr. Scipio irrigated Cason's bladder and directed Cason to keep the Foley catheter in place for one week. *Id.* at 25-26.

On August 24, 2018, Dr. Getachew examined Cason at Bon Secours and noted that Dr. Scipio had prescribed the antibiotic ciprofloxacin for a suspected UTI and that Cason had no

---

[6] A suprapubic catheter is used when the urethra is damaged or blocked, or when a patient is unable to use an intermittent catheter. ECF No. 17-3 ¶ 12. A suprapubic catheter, inserted into the bladder through a small cut in the abdomen, reduces the incidence of UTIs and are generally more comfortable for the patients. *Id.*

bleeding during the visit.  *Id.*  Dr. Getachew also noted that a urine culture done during Cason's previous admission showed he had Klebsiella pneumoniae, a bacteria resistant to ciprofloxacin. Getachew determined that Cason required further consultation with an infectious disease specialist.  *Id.*

Cason was discharged from Bon Secours and admitted to the Jessup Regional Infirmary ("JRI").  ECF No. 17-10 at 5.  On August 25, 2018, Cason saw Dr. Sisay, who prescribed extra strength Tylenol for pain.  *Id.*  On August 26, 2018, Cason saw Dr. Bishaw during weekend rounds, at which time Cason reported no fever or bleeding.  *Id.* at 11.  On August 27, 2018, JRI medical staff submitted a follow up consultation request to Bon Secours Urology.  *Id.* at 17; ECF No. 17-8 at 76.  Dr. Sisay, Dr. Bishaw, and the JRI medical staff continued to monitor Cason several times a day through September 6, 2018.  ECF No. 17-10 at 18-71.

On September 7, 2018, at a follow up with Dr. Scipio, Cason appeared to be doing well, reported no pain, and had no new complaints.  ECF No. 17-8 at 70-74.  Dr. Scipio again recommended placement of a suprapubic catheter, but Cason "continue[d] to refuse."  *Id.* at 71. As a result, Dr. Scipio advised Cason to continue the current management plan but noted that "hematuria may reoccur with self-catheterization."  *Id.*  On September 10, 2018, Cason returned to DRCF.  ECF No. 17-10 at 88.

On October 5, 2018, Cason consulted with Dr. Scipio "to discuss and agree on the insertion of a suprapubic catheter."  ECF No. 17-12 at 55.  Again, Dr. Scipio noted that Cason was doing well, reported no pain, and had no new complaints.  *Id.*  Cason "decided to continue self-catheterization but will consider suprapubic catheter as an alternative."  *Id.* at 56.

On October 9, 2018, Cason saw Dr. Onabajo at the DRCF medical unit for a scheduled visit.  ECF No. 17-11 at 14.  Dr. Onabajo noted that Cason's hematuria had resolved, and he

discussed the advantages and disadvantages of a suprapubic catheter, advising Cason "to think about it as opposed to just refusing it." *Id.*

From December 2018 to May 2019, Cason continued to see Dr. Onabajo for his chronic health problems. *See id.* at 727-59. During that time, Cason complained of pain in his groin/hip area, for which he was given muscle relaxers; breakthrough pain attributed to degenerative joint disease, for which he was given pain medication; and bacteria in his urine, for which he was given antibiotics. *Id.* Dr. Onabajo notes that Cason's frequent UTIs resulted from "the need to catheterize himself multiple times per day due to his neurogenic bladder." ECF No. 17-3 ¶ 37. Dr. Onabajo notes that "[a]lthough placement of a suprapubic catheter would eliminate the need to self-catheterize and reduce the risk of UTIs, [Cason] has refused . . . the procedure." *Id.*

On August 23, 2019, Cason was transferred from DRCF to WCI. ECF No. 17-4 at 19. Throughout the time relevant to this Complaint, Cason had been provided consistent, two-week supplies of catheters from August 1, 2018 to April 13, 2020, which he either accepted or refused to pick up. *See* ECF No. 17-4 at 2-62; ECF No. 17-7 at 30-33.

## II.    Standards of Review

Certain defendants move to dismiss the Complaint for failing to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In reviewing the motion, the Court accepts the well-pleaded allegations as true and in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "However, conclusory statements or a 'formulaic recitation of the elements of a cause of action will not [suffice].'" *EEOC v. Performance Food Grp., Inc.*, 16 F. Supp. 3d 584, 588 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint

to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

Although pro se pleadings are construed generously to allow for the development of a potentially meritorious case, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980), courts cannot ignore a clear failure to allege facts setting forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) ("The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may properly be addressed.") (internal citation omitted)). "A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are not more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009).

The Corizon and Wexford Defendants move alternatively for summary judgment to be granted in their favor. Their pleadings and submission of record evidence place Cason on notice that the Court may reach the propriety of summary judgment. *See* Fed. R. Civ. P. 56(d). Because the parties have been given reasonable opportunity to present all pertinent material and Cason has not filed an affidavit requesting further discovery under Rule 56(d), the Court will treat the Corizon and Wexford Defendants' motions as ones for summary judgment. *See* Fed. R. Civ. P. 12(d).

A motion for summary judgment brought pursuant to Rule 56 shall be granted if the movant demonstrates that no genuine issue of disputed material fact exists, rendering the movant entitled to judgment as a matter of law. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view the evidence in the light most favorable to the non-movant without weighing the evidence or assessing witness credibility. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-44 (4th Cir. 2002). Factually unsupported claims and defenses may not proceed to trial. *Bouchat*, 346 F.3d at 526.

## III.   Discussion

Cason argues that DOC facilities are not ADA-compliant, that he has been forced to reuse catheters at both DRCF and WCI, and that he has been denied programming because he is in a wheelchair. ECF No. 27 at 1-4; ECF No. 28. He further maintains that the delays in his treatment for his bladder problems first identified on July 14, 2018. ECF No. 28 at 2-3. Lastly, Cason believes that medical staff have discontinued his medication in retaliation for his having filed suit against them.[8] ECF No. 27 at 3-4. The Court first turns to Cason's ADA claims and then to the claims concerning his medical care.

### A.   ADA Claims

As to Cason's ADA claim, when viewing the Complaint facts most reasonably to him, the claim must fail. To establish a prima facie case under Title II of the ADA, the Complaint facts

---

[8] Cason also attempts to add claims in his response that are not included in his Complaint. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)). Thus, the Court declines to address these claims here.

must make plausible that Cason: (1) suffers from a disability; (2) was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016) (citing *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)); *Baird*, 192 F.3d at 467. To be sure, Cason has established that he has a disability. But no facts make plausible that he was excluded from or denied the benefits of any prison services, programs, or activities, or that such exclusion or that any such denial was based on his disability. The claims as pleaded, therefore, must be dismissed.

### B.     Medical Claims

Cason's claims raise whether he has been denied adequate medical treatment in violation of the Eighth Amendment to the United States Constitution. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, Cason must demonstrate that the Corizon and Wexford Defendants' acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff, aware of prisoner's need for medical attention, failed to either provide such care or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or

safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

"Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). *See also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting"). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto*, 841 F.3d at 225. Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)).

With this standard in mind, the Court turns to the claims as pleaded against the various defendants.

As an initial matter, the Court must dismiss DOC as a defendant because it is an entity not

capable of being sued.[9]  Section 1983 limits its reach to "[e]very *person* who, under color of [law] subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured," requires the claim to be asserted against a person.  42 U.S.C. § 1983 (emphasis added).  But neither the State, nor its agencies or officials acting within their official capacities, can be sued under § 1983 because they are not "persons."  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983.").  The DOC is an arm of the State, and accordingly, is not a "person" within the meaning of § 1983.  *See* Md. Code Ann., State Gov't § 8-201(b)(16) (identifying the DPSCS as a department of the Maryland state government); Md. Code Ann., Corr. Servs. § 2-201(1) (identifying the DOC as a unit within the DPSCS).

Moreover, under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  The State of Maryland it has not waived such immunity for claims brought pursuant to § 1983.  Accordingly, the DOC is immune from suit and the complaint as to the DOC is dismissed with prejudice.

As to the Corizon and Wexford Defendants, the Court treats the motions as one for summary judgment.  Based on the record evidence viewed most favorably to Cason, he clearly was suffering from a serious medical need.  But based on the same record, no evidence supports that the Corizon and Wexford Defendants disregarded the risks to Cason's health or failed to

---

[9] Although the Court gave Cason the opportunity to supplement his complaint to "include the names of any individuals whom he claims are responsible for the alleged wrongdoing," ECF No. 3, Cason did not add as defendants any individuals within the DOC.  Because DOC must be dismissed, Cason's motion for default judgment against the DOC is denied.

provide him with necessary medical care.  Specifically, the record demonstrates that from March 2018 to August 2019, the Corizon and Wexford Defendants continuously monitored Cason's urinary problems, provided pain medication, transported him for emergency services when necessary, and facilitated his appointments with a urologist.

As to Cason's contention that he went three days in July 2018 without medical care, the record indisputably reflects otherwise.  On July 14, 2018, medical staff responded to Cason's medical emergency; they found him bleeding from the penis, applied pressure to stop the bleeding, ordered pain medication, and placed him under observation.  Two days later, Cason followed up with Dr. Onabajo, who prescribed an antibiotic, ordered blood and urine tests, and directed Cason to return if his condition worsened.  Because Cason's bleeding subsequently returned, Cason reported to the medical unit the following morning and  was immediately transported to Bon Secours.  There, he received treatment and was feeling "much better."  When his symptoms returned, he against received appropriate medical treatment.  On this record, the Court simply finds no evidence to support that Defendants substandard medical attention resulted any delay of treatment.

Similarly with  Cason's claims that did not receive new catheters or had been denied his medication in retaliation for filing suit, the record evidence clearly demonstrates otherwise.  Medical staff made catheters available for pickup at both DRCF and WCI, and Cason either came to get them or refused the supplies.  Dr. Scipio and Dr. Onabajo both encouraged Cason to opt for a suprapubic catheter to decrease the chance of bladder infections, but he repeatedly refused.  Cason also received pain medication and antibiotics, as well as medically appropriate testing and treatment.

When viewed in the light most favorably to Cason, the Court cannot find that the Corizon

13

and Wexford Defendants exhibited a callous disregard for a serious medical need. *See also Farmer*, 511 U.S. at 835; *Estelle*, 429 U.S. at 105-06. To be sure, Cason has likely experienced great pain surrounding his bladder difficulties. But the record does not support that Cason was ignored or improperly treated. Thus, summary judgment must be granted in the Corizon and Defendants favor on the Eighth Amendment claim.

If Cason is attempting to hold Corizon as a corporate defendant liable for an Eighth Amendment violation, the claim likewise fails. Even though a private corporation can be found to engage in state action -- a necessary precondition for § 1983 liability -- the involvement of the corporation cannot be predicated on a respondeat superior liability theory. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services*, 316 Fed. Appx. 279, 282 (4th Cir. 2009). Officials acting in a supervisory capacity also cannot be held liable for the acts of their subordinates unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). No record evidence supports this theory of relief extending to Corizon, especially given that no record evidence allows a rational trier of fact to find the individual Corizon defendants liable. Thus, summary judgment is granted as to Corizon.

To the extent that Cason also brings medical negligence claims, the Court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without

prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). The medical negligence claims are dismissed without prejudice so that Cason may pursue them in state court, if possible.[10]

Finally, as to defendants Bon Secours and Dr. Scipio, Cason failed to perfect service against them, so they will be dismissed without prejudice. However, the Court also notes that no Complaint facts make plausible either Defendant had engaged in state action. Thus, the § 1983 claims, even if service were perfected, would have failed. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *see Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (only state actors are proper defendants under § 1983). Cason's motion for default judgment against the same defendants is denied.

## IV.    Conclusion

For the foregoing reasons, defendants Bon Secours and Dr. Scipio are dismissed without prejudice and DOC is dismissed with prejudice. The Court grants summary judgment in favor of the Corizon and Wexford Defendants' motions as to the § 1983 claims and declines to exercise supplemental jurisdiction as to all state common law claims. Cason's motion for default judgment is denied.

A separate Order follows.

| | |
|---|---|
| _____1/25/21_____ | _____/S/_____ |
| Date | Paula Xinis |
| | United States District Judge |

---

[10] To sustain a medical malpractice claim in state court, Cason must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, which requires a plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office prior to filing suit when the claimed damages exceeds the jurisdictional amount for the state district courts. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md. App. 1, 3 (1987).